## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF PUERTO RICO

2016 JUN -1  PM 3: 31

IN THE MATTER OF

JOSE A. RIVERA MERCADO

Case No.: 16-03242 (MC)

Chapter 13

### MOTION FOR MODIFICATION OF STAY PURSUANT
### TO FRBP 4001(a) 1 & §362(d)

**TO THE HONORABLE COURT:**

**COMES NOW** Movant, ZORAIDA MONTAÑEZ CARRASQUILLO, through counsel and respectfully states and requests as follows:

1.      On April 25, 2016 the above named debtor filed a voluntary petition under Chapter 13 of the Bankruptcy Code.

2.      By the provisions of 11 U.S.C. §362, all persons are enjoined from commencing or continuing any suit against debtor.

3.      On April 8, 2016 Movant Zoraida Montañez Carrasquillo filed a lawsuit against the debtor and others as plaintiff, before the First Instance Superior Court, Caguas Part, Civil No. EDP2016-0089 (701).

4.      This lawsuit was the direct result of medical and hospital malpractice caused by debtor Dr. José A. Rivera Mercado and others, which occurred on several visits to the hospital from November 25 to December 25, 2014, causing movant physical, moral and emotional damages.

1

5.      Movant's lawsuit was filed before the instant petition has commenced and stayed, when debtor informed the local court through counsel that it was filing for bankruptcy.  The aforementioned complaint is attached herewith and marked as Exhibit 1.

6.      The medical and hospital malpractice civil lawsuit is in the discovery stage and plaintiff has not been able to continue procedures against co-defendant Dr. Jose A. Rivera Mercado because of the automatic stay in this case.

7.      It is necessary that the automatic stay be modified in order to continue the already commenced civil action and avoid any further interruption and delay in the procedures and be able to properly made the negligence allocation among defendants and eventually quantify this creditor's damages and claims.

8.      Movant requests the modification of the automatic stay in relation to debtor, until Judgment is issued by the First Instance Superior Court, Caguas Part, and relief from the automatic stay in relation to Dr. Jose A. Rivera Mercado.

9.      The remedy requested herein will not hinder, burden, delay or be inconsistent with this proceeding.

10.      There is cause for the modification of the automatic stay in the instant proceeding in relation to debtor.

**WHEREFORE,** it is respectfully requested that the stay afforded by 11 U.S.C. §362 be modified so as to permit Movant to continue the aforementioned lawsuit against debtor, in the now pending cause of action before the First Instance Superior Court, Caguas Part, Civil No. EDP 2016-0089 (701).

In Caguas, Puerto Rico this 27th. Day of May, 2016.

2

**I CERTIFY** that on this same date I sent by certified mail copy of this document to

Attorneys: Nuyen Marrero Bonilla, PO Box 195659, San Juan, Puerto Rico 00919; Miguel E.

Sagardía De Jesús, 261 Ave. Domenech, San Juan, Puerto Rico 00918-3518; Nydia González

Ortiz, 11 Betances St., Yauco, Puerto Rico 00698, (Debtor's Counsel) and Monsita Lecaróz

Arribas, Office of the U.S. Trustee, Ochoa Building, 500 Tanca Street Suite 301, San Juan,

Puerto Rico 00901.

Velazquez Law Offices, PSC

Attorneys for movant
PO Box 188
Caguas, Puerto Rico 00726
Tel. 787-744-9598
Fax 787-3482
E-mail: jfvlaw@gmail.com

José F. Velázquez-Ortiz
USDC-PR 123310

3

EXHIBIT I

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
Centro Judicial de Caguas
Sala Superior

| | |
|---|---|
| ZORAIDA MONTAÑEZ CARRASQUILLO<br>*Demandantes*<br><br>Vs.<br><br>HOSPITAL MENONITA CAGUAS, INC.,<br>DR. JOSE A. RIVERA MERCADO,<br>SINDICATO PARA LA SUSCRIPCION<br>CONJUNTA DE SEGUROS DE<br>RESPONSABILIDAD PROFESIONAL<br>MEDICO HOSPITALARIA (SIMED) y<br>ABC INSURANCE COMPANY<br>*Demandados* | CIVIL NUM. EDP2016 - 0069<br>701<br><br>SOBRE:<br><br>004<br><br>DAÑOS Y PERJUICIOS<br>(Impericia médico-hospitalaria) |

- D E M A N D A -

AL HONORABLE TRIBUNAL:

COMPARECE la parte demandante, por conducto de su representación profesional que suscribe y, muy respetuosamente, expone, alega y solicita:

1.      La demandante, dama de 44 años de edad a la fecha de los hechos, referida indistintamente en lo sucesivo como Zoraida/paciente, reside en Urb. Villa Nueva, H 46, Calle 10, Caguas, Puerto Rico 00727-6927, Tel. 787-595-7830.

2.      El codemandado Dr. José A. Rivera Mercado, es un médico ginecólogo, para la fecha de los hechos, con privilegios para admitir y tratar pacientes en el Hospital Menonita Caguas, Inc.

3.      Hospital Menonita Caguas, Inc. es una entidad corporativa debidamente acreditada bajos las leyes del Estado Libre Asociado, siendo una institución hospitalaria radicada en la ciudad de Caguas, Puerto Rico y dedicada a brindar servicios de salud.

4.      El 3 de octubre de 2014, Zoraida fue admitida al Hospital HIMA San Pablo Caguas con quejas de mareos y sangramiento vaginal profuso de tres días de duración. Su nivel de hemoglobina ese día se reportó en 8.7 gramos y el hematocrito en 27.4%. Un sonograma pélvico hecho el 1 de octubre previo había registrado un útero de 11.1 x 7.2 x 4.7 centímetros.

5.    Se le diagnosticó anemia sintomática y se le administraron dos transfusiones de células rojas. El nivel de hemoglobina subió a 10.9 gramos y el hematocrito a 34%, luego de lo cual fue dada de alta para seguimiento con un ginecólogo a nivel ambulatorio.

6.    El 22 de noviembre de 2014 Zoraida acudió a la sala de emergencias del Hospital Menonita de Caguas a las 7:23 am con queja de dolor pélvico y sangrado vaginal abundante y fue admitida para Observación, ordenándosele pruebas de laboratorio, suero endovenoso y analgésicos.

7.    El hemograma ordenado evidenció una hemoglobina de 11.7 gramos, un hematocrito de 35.5%, un contaje de glóbulos blancos de 11,500 y un contaje de plaquetas de 371,000, mientras un sonograma transvaginal describe el útero y los ovarios normales, sin evidencia de masas ni líquido libre en el *cul de sac*.

8.    A las 12:17 del mediodía se le dio de alta en condición descrita como estable y no se especifican las instrucciones dadas a la paciente y aparentemente no se le dio cita médica ni referido.

9.    El 25 de noviembre de 2014 se admite a la paciente en el Hospital Menonita de Caguas, con diagnósticos de dolor pélvico agudo, sangramiento uterino anormal, útero miomatoso agrandado y hemorragia vaginal, siendo su nivel de hemoglobina de 11.3 gramos a las 8:30 am de ese día.

10.    De la sala de emergencias se consultó al Dr. José A. Rivera Mercado, quien registró que la paciente llevaba ocho días con flujo menstrual, anotando historiales previos de isquemia cerebral, depresión, ansiedad y osteopenia, más no se acreditó haberle hecho un examen pélvico.

11.    Habiendo sido admitida para tratamiento, a las 9:00 pm del 25 de noviembre el doctor Rivera Mercado escribe que el sangrado no se había detenido.

12.    Para el 26 de noviembre se acredita que la paciente continuaba sangrando y con dolor, informando al siguiente día que tenía coágulos y dolor pélvico. Añade el doctor Rivera Mercado en su nota que la paciente "comprende" el procedimiento y que tiene disposición para llevarla a sala de operaciones al día siguiente para histerectomía.

13.    La paciente firmó el 28 de noviembre un formulario titulado "Consentimiento Especial para Operación", careciendo éste de firma de testigo alguno, en el que se autoriza al

médico a sacar el útero y el ovario "afectado", además para reposicionar la vejiga, debido a hemorragia vaginal y útero miomatoso.

14.     Aunque no se anota en el formulario de consentimiento patología alguna que justificara la remoción de un ovario, se anotan los riesgos de muerte, laceración intestinal, laceración vesical, hemorragia, embolia y añade "etc".

15.     Según programado, el 28 de noviembre el doctor Rivera Mercado operó a la paciente, de 11:05am a 11:55am, haciéndole una histerectomía total abdominal y una salpingectomía y oforectomía izquierda (remoción del útero, además del oviducto y el ovario izquierdos), así como lisis de múltiples adherencias.

16.     Aunque en el formulario sobre reporte operatorio se describe extensamente que se verificó la hemostasia, en lado alguno describe que se haya removido el ovario y el oviducto izquierdos.

17.     El informe de patología de los órganos removidos reflejó que tenía en el endometrio un pólipo, con dimensiones de 2.9 x 0.9 x 0.2 centímetros y un segundo pólipo de 0.9 x 0.7 x 0.3 centímetros.

18.     Los pólipos encontrados en el endometrio, muy probablemente, ocasionaban el sangramiento de la paciente.

19.     Los niveles de hemoglobina de la paciente a partir de la cirugía descrita fueron de 9.3 gramos a las 5:34pm y 8.9 gramos a las 11:33pm, por lo que a las 11:45pm el doctor Rivera Mercado ordenó transfundirle dos unidades de células rojas.

20.     La hemoglobina era de 10.1 gramos a las 5:23pm del 29 de noviembre. De ese nivel comenzó a descender nuevamente hasta alcanzar 8.6 gramos el 1ro. de diciembre a las 8:47pm. El 2 de diciembre el doctor Rivera Mercado ordenó dos transfusiones adicionales de células rojas y la dio de alta a las 8:16pm de ese día.

21.     Alrededor del mediodía del 5 de diciembre, Zoraida regresó al Hospital Menonita de Caguas, quejándose de debilidad y de que poco antes había comenzado con sangramiento vaginal, describiéndose como con angustia ("distress") moderada.

22.     El médico de sala de emergencias no le hizo examen pélvico, pero ordenó un sonograma pélvico y pruebas de laboratorio. El sonograma describe que no se visualizó el útero ni los ovarios, mientras el hemograma reflejó un nivel de hemoglobina de 9.5 gramos,

hematocrito de 28.5%, un contaje de glóbulos blancos de 21,600, con el contaje diferencial presentando un 81% de neutrófilos.

23.    Se consultó al doctor Rivera Mercado a las 4:00pm, evaluando éste a la paciente a las 8:45pm de ese día, sin que hiciera un examen pélvico.

24.    Luego de su intervención con la paciente, escribió en su nota que la dio de alta con una hemoglobina de 8.4 gramos, pero el 8 está tachado y se ve un 9 sobreimpuesto. Aunque acredita que la dio de alta *"with all instructions"* (con todas las instrucciones), no especifica su nota el contenido de esas instrucciones.

25.    El 10 de diciembre de 2014, cinco días más tarde, la paciente regresó nuevamente a la sala de emergencias del Hospital Menonita de Caguas, quejándose de sangramiento vaginal y dolor.

26.    En el examen físico hecho en la sala de emergencias no se describe que se le haya hecho un examen pélvico, más se ordenó un hemograma demostrando que el nivel de hemoglobina estaba en 10.0 gramos, el hematocrito en 29.9%, el contaje de glóbulos blancos en 15,400, con el contaje diferencial demostrando 78% de neutrófilos.

27.    Se realizó una tomografía computadorizada de abdomen y pelvis, sin contraste, opinando el radiólogo que interpretó el estudio que no se podía excluir la presencia de un hematoma o un absceso pélvico postoperatorio.

28.    A las 11:05pm del 10 de diciembre se le puso una consulta al doctor Rivera Mercado, contestándola a las 3:00pm del día siguiente, 11 de diciembre.

29.    De acuerdo a su nota, no realizó un examen pélvico a la paciente, limitándose a ordenar la administración de una dosis de 400 mg de Cipro® y luego a darla de alta con visita posterior a su oficina.

30.    Dos días más tarde, el 13 de diciembre, doña Zoraida regresó una vez más a la sala de emergencias del Hospital Menonita de Caguas, quejándose nuevamente de sangramiento vaginal.

31.    Ese día se puso una consulta al doctor Rivera Mercado a las 7:00am en la que se registra un nivel de hemoglobina de 9 gramos, ordenando por vía telefónica transfundir dos unidades de células rojas a la paciente.

32.     Cuando vio a la paciente a las 11:00am, le diagnosticó sangramiento vaginal activo, tratamiento incompleto de infección urinaria y anemia de 9.9 gramos, admitiéndola a su servicio.

33.     La nota de progreso de admisión refiere que la paciente le dijo al doctor Rivera Mercado que había tenido fiebre y mareos. Las órdenes de admisión incluyeron un CT-Scan abdomino-pélvico, hematínicos y antibióticos. Unas horas más tarde el doctor Rivera Mercado ordenó por vía telefónica omitir el estudio de CT.

34.     Varios médicos fueron consultados. La consulta al infectólogo doctor Armando Torres se contestó el 16 de diciembre a las 3:15pm y registra un historial de sangramiento masivo y pérdida de conocimiento por la paciente; describe dolor, eritema y tal vez alguna fluctuación en el área de la herida quirúrgica.

35.     Para la visita del doctor Torres, el contaje de glóbulos blancos estaba en 17,800 y el diferencial demostraba 74 neutrófilos, entendiendo que había que descartar la presencia de un absceso pélvico o de seroma infectado, por lo que recomendó antibióticos.

36.     El 17 de diciembre el doctor Rivera Mercado efectuó un procedimiento en la herida abdominal de la paciente, encontrando un seroma en la herida que evacuó, limpió, desbridando el área, colocó drenajes y cerró la herida con grapas.

37.     El 19 de diciembre fue necesario llevar a la paciente a la sala de operaciones y suturar puntos sangrantes en el muñón vaginal.

38.     El 20 de diciembre el nivel de hemoglobina de la paciente se reportó en 7.7 gramos, siendo necesaria una nueva transfusión de sangre, siendo dada de alta al día siguiente, aparentemente sin sangramiento activo y con un nivel de hemoglobina de 11.0 gramos.

39.     Zoraida regresó una vez más a la sala de emergencias del Hospital Menonita de Caguas el 25 de diciembre a la 1:40pm, describiendo su queja como sangramiento vaginal de comienzo súbito, corroborándose un sangramiento activo al examen externo.

40.     A las 2:30pm se puso una consulta al doctor Rivera Mercado, la cual fue contestada a las 11:00pm, registrando la queja de sangramiento del muñón vaginal y ordenando su admisión, siendo su nivel de hemoglobina reportado esa tarde de 12.3 gramos.

41.     Una nota de las 4:20pm dice que se hizo reparación del muñón vaginal y que se removieron grapas quirúrgicas del área., siendo la paciente transferida a la sala de recuperación a las 5:00pm y ordenándose su alta una o dos horas después.

42.    El 31 de diciembre de 2014 Zoraida acude al Hospital Universitario del Centro Médico de Puerto Rico, donde fue admitida con una queja principal de sangramiento vaginal y diagnósticos de admisión de sangramiento por el muñón vaginal, hematoma pélvico y sospecha de enfermedad de von Willebrand.

43.    Se practicó una tomografía computadorizada el 1 de enero de 2015 en la que se identificó una colección retrovesical y supravesical con cambios sugestivos de absceso y hematoma, consultándose al servicio de Hematología/Oncología quienes no encontraron evidencia de desorden de la coagulación en la paciente y opinaron que el problema era uno producido por las cirugías previas.

44.    Se encontró la paciente con un nivel de hemoglobina de 6.5 gramos y un hematocrito de 19.5% por lo que se recomendó por hematología la administración de 2 unidades de glóbulos rojos, 4 unidades de plasma fresca congelada y 1 aféresis de plaquetas. El 4 de enero se administraron 2 unidades adicionales de glóbulos rojos.

45.    Se consultó, además, al servicio de Enfermedades Infecciosas quienes le dieron seguimiento a la terapia con antibióticos intravenosos. El contaje de glóbulos blancos el 31 de diciembre había sido de 23,100 con un contaje diferencial de 81% de neutrófilos.

46.    Para el 5 de enero se estaba manejando la condición de la paciente como que tenía sepsis clínica, habiendo presentado el 2 de enero un pico de fiebre de 39.5 grados centígrados, pero la curva de temperatura comenzó a mejorar y de ahí en adelante no superó 37.8 grados centígrados.

47.    El 12 de enero se repitió el CT-Scan abdomino/pélvico, encontrando una pequeña colección en el espacio paravesical encima del muñón vaginal, la cual se consideró una mejoría en comparación con el estudio anterior, no identificándose la presencia de fístula alguna.

48.    La evolución clínica de la paciente continuó mejorando y se le pudo dar de alta el 16 de enero de 2015. La nota médica de alta ofrece diagnósticos de absceso pélvico, sangramiento y pequeña dehiscencia del muñón vaginal. Sus signos vitales estaban estables. Su nivel de hemoglobina era de 12.7 gramos, su hematocrito era 39.1%, su contaje de glóbulos blancos era normal (9,730) y su contaje de plaquetas 589,000. Se le consideró lista para irse de alta a su casa y completar allí la terapia de antibióticos.

49.    El doctor Rivera Mercado sometió a la demandante a una cirugía sin indicación válida y, por tanto, sin consentimiento informado, removiéndole su útero y un ovario

innecesariamente, omitiendo la evaluación del endometrio que estaba indicada y que, con la mayor de las probabilidades, hubiese resuelto su problema de sangramiento uterino anormal al removerse los pólipos endometriales que en realidad tenía.

50.    La cirugía de histerectomía innecesaria y asimismo la remoción de ovario practicada por el doctor Rivera Mercado, constituyó un acto negligente o culposo, que ocasionó que la paciente desarrollara un hematoma/absceso que fue sospechado por un radiólogo que le hizo un CT-Scan desde el 10 de diciembre, y que fue ignorado o pasado por alto de forma negligente por el doctor Rivera Mercado.

51.    Luego de darla de alta tras la cirugía innecesaria, el doctor Rivera Mercado siguió manejando de forma negligente a su paciente, resultando ello en la causa de todos sus daños posteriores, porque, además, ignoró que el nivel de hemoglobina de la paciente continuaba descendiendo y su contaje de glóbulos blancos se mantenía elevado, no encontrando nunca la causa del problema que él le había provocado, viéndose obligada a acudir al centro médico para que la evaluaran correctamente y le resolviesen eventualmente sus problemas de salud.

52.    Como resultado de las desviaciones a la mejor práctica de la medicina del doctor Rivera Mercado, incluyendo la cirugía no indicada, la paciente ahora carece de su útero y de uno de sus ovarios y, además, padeció complicaciones de salud serias, que han sido relatadas en detalle precedentemente y que le disminuyeron significativamente su calidad de vida por mucho tiempo.

53.    El doctor Rivera Mercado ha sido demandado en múltiples ocasiones por actos u omisiones constitutivos de impericia médica, concluyendo al menos uno de esos casos judiciales con una sentencia en su contra y en favor de las víctimas de impericia médica.

54.    El historial completo de los casos judiciales sobre eventos de impericia médica en que el Dr. José A. Rivera Mercado ha sido demandado y que sus aseguradores han efectuado pagos en favor de sus víctimas surge del "National Practitioners Data Bank", un banco de datos al cual el hospital demandado tuvo o debió de tener acceso previo a concederle y renovarle privilegios para admitir y tratar pacientes en la referida institución hospitalaria.

55.    El presidente de la Junta de Directores del hospital demandado, el Director Médico, el Director de su Facultad Médica y el de su Departamento de Obstetricia y Ginecología estuvieron directa y activamente envueltos en el proceso de extenderle y renovarle, varias veces, los privilegios para admitir y tratar paciente como parte de la facultad médica y tenían pleno

conocimiento o debieron tenerlo, de los resultados de múltiples requerimientos de información al banco de datos de donde surgían los detalles de los casos de impericia médica que han sido radicados y concluidos mediante pagos relacionadas al médico demandado.

56.     No obstante haber tenido o debido tener conocimiento previo de las múltiples demandas de impericia médica en contra del doctor Rivera Mercado y del resultado de cada una de éstas, el hospital demandado decidió conceder privilegios y renovárselos para admitir y tratar pacientes gineco-obstétricos en la referida institución hospitalaria, exponiendo de esa manera a pacientes, como la demandante, a sufrir daños a sus manos, incurriendo por ello en negligencia corporativa.

57.     La responsabilidad corporativa incurrida en el proceso de extenderle y renovarle negligentemente o con conocimiento los privilegios a Rivera Mercado tiene un vínculo causal directo con los daños sufridos por la parte demandante.

58.     El Hospital Menonita de Caguas, Inc. es también responsable por la negligencia del doctor Rivera Mercado en función de la doctrina de autoridad aparente porque éste fue designado para tratar a la paciente en esa institución.

59.     La negligencia exclusiva de la parte demandada ocasionó los daños que ha sufrido la parte demandante y que se reclamarán subsiguientemente.

60.     Se incluye a SIMED por haber expedido póliza de seguro en favor del médico codemandado y cubriendo los daños ocasionados por motivo de su negligencia profesional.

61.     Se incluye también a ABC Insurance Company, con nombre ficticio, por haber expedido póliza de seguro en favor del hospital codemandado, cubriendo los daños ocasionados por motivo de su negligencia corporativa y por la negligencia de su médico asignado para tratar a la paciente o por haber asegurado también al médico demandado.

62.     Como consecuencia de lo aseverado en los párrafos que preceden, la demandante Zoraida Montañez Carrasquillo ha sufrido, sufre y sufrirá daños y sufrimientos morales y angustias mentales por lo relatado que experimentó y experimentará, que estima en la suma de $500,000.00.

63.     La parte demandada es responsable solidariamente de los daños ocasionados a la parte demandante.

64.     El término prescriptivo aplicable a este caso fue debidamente interrumpido mediante la interposición de una demanda el 17 de octubre de 2015 ante el Tribunal de Primera

Instancia, Sala de Caguas, que llevó el Número Civil EDP2015-0267, siendo desistida voluntariamente por la parte demandante el 18 de noviembre de 2015 y dictada sentencia Sin Perjuicio de conformidad.

**EN MERITO DE LO ANTERIOR**, se solicita de este Honorable Tribunal declare con lugar la presente demanda y, en su virtud, condene a la parte demandada a satisfacer a la parte demandante los daños reclamados, más las costas, intereses pre-sentencia y una suma razonable en concepto de honorarios de abogado.

En Caguas, Puerto Rico, a 8 de abril de 2016.

CERTIFICO: Haber remitido copia de Demanda al Comisionado de Seguros de Puerto Rico y a la Junta de Licenciamiento y Disciplina Médica de PR, a sus direcciones postales conocidas.

**VELÁZQUEZ LAW OFFICES, PSC**

Abogados de la parte demandante
PO Box 188
Caguas, Puerto Rico 00726
Tel. 787-744-9598
Fax 787-744-3482

José F. Velázquez Ortiz
RUA 5358
E-mail: jfvlaw@gmail.com

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
Centro Judicial de Caguas
Sala Superior

|  |  |
|---|---|
| ZORAIDA MONTAÑEZ CARRASQUILLO<br>*Demandantes*<br><br>Vs.<br><br>**HOSPITAL MENONITA CAGUAS, INC.,<br>DR. JOSE A. RIVERA MERCADO,<br>SINDICATO PARA LA SUSCRIPCION<br>CONJUNTA DE SEGUROS DE<br>RESPONSABILIDAD PROFESIONAL<br>MEDICO HOSPITALARIA (SIMED) y<br>ABC INSURANCE COMPANY**<br>*Demandados* | **CIVIL NUM. EDP2016-0089 (701)**<br><br><br><br>**SOBRE:**<br><br><br><br><br><br>**DAÑOS Y PERJUICIOS**<br>**(Impericia médico-hospitalaria)** |

- DEMANDA ENMENDADA -

**AL HONORABLE TRIBUNAL:**

**COMPARECE** la parte demandante, por conducto de su representación profesional que suscribe y, muy respetuosamente, expone, alega y solicita:

1.   La demandante, dama de 44 años de edad a la fecha de los hechos, referida indistintamente en lo sucesivo como Zoraida/paciente, reside en Urb. Villa Nueva, H 46, Calle 10, Caguas, Puerto Rico 00727-6927, Tel. 787-595-7830.

2.   El codemandado Dr. José A. Rivera Mercado, es un médico ginecólogo, para la fecha de los hechos, con privilegios para admitir y tratar pacientes en el Hospital Menonita Caguas, Inc.

3.   Hospital Menonita Caguas, Inc. es una entidad corporativa debidamente acreditada bajo las leyes del Estado Libre Asociado, siendo una institución hospitalaria radicada en la ciudad de Caguas, Puerto Rico y dedicada a brindar servicios de salud.

4.   El 3 de octubre de 2014, Zoraida fue admitida al Hospital HIMA San Pablo Caguas con quejas de mareos y sangramiento vaginal profuso de tres días de duración. Su nivel de hemoglobina ese día se reportó en 8.7 gramos y el hematocrito en 27.4%. Un sonograma pélvico hecho el 1 de octubre previo había registrado un útero de 11.1 x 7.2 x 4.7 centímetros.

5.  Se le diagnosticó anemia sintomática y se le administraron dos transfusiones de células rojas. El nivel de hemoglobina subió a 10.9 gramos y el hematocrito a 34%, luego de lo cual fue dada de alta para seguimiento con un ginecólogo a nivel ambulatorio.

6.  El 22 de noviembre de 2014 Zoraida acudió a la sala de emergencias del Hospital Menonita de Caguas a las 7:23 am con queja de dolor pélvico y sangrado vaginal abundante y fue admitida para Observación, ordenándosele pruebas de laboratorio, suero endovenoso y analgésicos.

7.  El hemograma ordenado evidenció una hemoglobina de 11.7 gramos, un hematocrito de 35.5%, un contaje de glóbulos blancos de 11,500 y un contaje de plaquetas de 371,000, mientras un sonograma transvaginal describe el útero y los ovarios normales, sin evidencia de masas ni líquido libre en el *cul de sac*.

8.  A las 12:17 del mediodía se le dio de alta en condición descrita como estable y no se especifican las instrucciones dadas a la paciente y aparentemente no se le dio cita médica ni referido.

9.  El 25 de noviembre de 2014 se admite a la paciente en el Hospital Menonita de Caguas, con diagnósticos de dolor pélvico agudo, sangramiento uterino anormal, útero miomatoso agrandado y hemorragia vaginal, siendo su nivel de hemoglobina de 11.3 gramos a las 8:30 am de ese día.

10.  De la sala de emergencias se consultó al Dr. José A. Rivera Mercado, quien registró que la paciente llevaba ocho días con flujo menstrual, anotando historiales previos de isquemia cerebral, depresión, ansiedad y osteopenia, más no se acreditó haberle hecho un examen pélvico.

11.  Habiendo sido admitida para tratamiento, a las 9:00 pm del 25 de noviembre el doctor Rivera Mercado escribe que el sangrado no se había detenido.

12.  Para el 26 de noviembre se acredita que la paciente continuaba sangrando y con dolor, informando al siguiente día que tenía coágulos y dolor pélvico. Añade el doctor Rivera Mercado en su nota que la paciente "comprende" el procedimiento y que tiene disposición para llevarla a sala de operaciones al día siguiente para histerectomía.

13.  La paciente firmó el 28 de noviembre un formulario titulado "Consentimiento Especial para Operación", careciendo éste de firma de testigo alguno, en el que se autoriza al

médico a sacar el útero y el ovario "afectado", además para reposicionar la vejiga, debido a hemorragia vaginal y útero miomatoso.

14.    Aunque no se anota en el formulario de consentimiento patología alguna que justificara la remoción de un ovario, se anotan los riesgos de muerte, laceración intestinal, laceración vesical, hemorragia, embolia y añade "etc".

15.    Según programado, el 28 de noviembre el doctor Rivera Mercado operó a la paciente, de 11:05am a 11:55am, haciéndole una histerectomía total abdominal y una salpingectomía y oforectomía izquierda (remoción del útero, además del oviducto y el ovario izquierdos), así como lisis de múltiples adherencias.

16.    Aunque en el formulario sobre reporte operatorio se describe extensamente que se verificó la hemostasia, en lado alguno describe que se haya removido el ovario y el oviducto izquierdos.

17.    El informe de patología de los órganos removidos reflejó que tenía en el endometrio un pólipo, con dimensiones de 2.9 x 0.9 x 0.2 centímetros y un segundo pólipo de 0.9 x 0.7 x 0.3 centímetros.

18.    Los pólipos encontrados en el endometrio, muy probablemente, ocasionaban el sangramiento de la paciente.

19.    Los niveles de hemoglobina de la paciente a partir de la cirugía descrita fueron de 9.3 gramos a las 5:34pm y 8.9 gramos a las 11:33pm, por lo que a las 11:45pm el doctor Rivera Mercado ordenó transfundirle dos unidades de células rojas.

20.    La hemoglobina era de 10.1 gramos a las 5:23pm del 29 de noviembre. De ese nivel comenzó a descender nuevamente hasta alcanzar 8.6 gramos el 1ro. de diciembre a las 8:47pm. El 2 de diciembre el doctor Rivera Mercado ordenó dos transfusiones adicionales de células rojas y la dio de alta a las 8:16pm de ese día.

21.    Alrededor del mediodía del 5 de diciembre, Zoraida regresó al Hospital Menonita de Caguas, quejándose de debilidad y de que poco antes había comenzado con sangramiento vaginal, describiéndose como con angustia ("distress") moderada.

22.    El médico de sala de emergencias no le hizo examen pélvico, pero ordenó un sonograma pélvico y pruebas de laboratorio. El sonograma describe que no se visualizó el útero ni los ovarios, mientras el hemograma reflejó un nivel de hemoglobina de 9.5 gramos,

hematocrito de 28.5%, un contaje de glóbulos blancos de 21,600, con el contaje diferencial presentando un 81% de neutrófilos.

23.   Se consultó al doctor Rivera Mercado a las 4:00pm, evaluando éste a la paciente a las 8:45pm de ese día, sin que hiciera un examen pélvico.

24.   Luego de su intervención con la paciente, escribió en su nota que la dio de alta con una hemoglobina de 8.4 gramos, pero el 8 está tachado y se ve un 9 sobreimpuesto. Aunque acredita que la dio de alta *"with all instructions"* (con todas las instrucciones), no especifica su nota el contenido de esas instrucciones.

25.   El 10 de diciembre de 2014, cinco días más tarde, la paciente regresó nuevamente a la sala de emergencias del Hospital Menonita de Caguas, quejándose de sangramiento vaginal y dolor.

26.   En el examen físico hecho en la sala de emergencias no se describe que se le haya hecho un examen pélvico, más se ordenó un hemograma demostrando que el nivel de hemoglobina estaba en 10.0 gramos, el hematocrito en 29.9%, el contaje de glóbulos blancos en 15,400, con el contaje diferencial demostrando 78% de neutrófilos.

27.   Se realizó una tomografía computadorizada de abdomen y pelvis, sin contraste, opinando el radiólogo que interpretó el estudio que no se podía excluir la presencia de un hematoma o un absceso pélvico postoperatorio.

28.   A las 11:05pm del 10 de diciembre se le puso una consulta al doctor Rivera Mercado, contestándola a las 3:00pm del día siguiente, 11 de diciembre.

29.   De acuerdo a su nota, no realizó un examen pélvico a la paciente, limitándose a ordenar la administración de una dosis de 400 mg de Cipro® y luego a darla de alta con visita posterior a su oficina.

30.   Dos días más tarde, el 13 de diciembre, doña Zoraida regresó una vez más a la sala de emergencias del Hospital Menonita de Caguas, quejándose nuevamente de sangramiento vaginal.

31.   Ese día se puso una consulta al doctor Rivera Mercado a las 7:00am en la que se registra un nivel de hemoglobina de 9 gramos, ordenando por vía telefónica transfundir dos unidades de células rojas a la paciente.

32.   Cuando vio a la paciente a las 11:00am, le diagnosticó sangramiento vaginal activo, tratamiento incompleto de infección urinaria y anemia de 9.9 gramos, admitiéndola a su servicio.

33.   La nota de progreso de admisión refiere que la paciente le dijo al doctor Rivera Mercado que había tenido fiebre y mareos. Las órdenes de admisión incluyeron un CT-Scan abdomino-pélvico, hematínicos y antibióticos. Unas horas más tarde el doctor Rivera Mercado ordenó por vía telefónica omitir el estudio de CT.

34.   Varios médicos fueron consultados. La consulta al infectólogo doctor Armando Torres se contestó el 16 de diciembre a las 3:15pm y registra un historial de sangramiento masivo y pérdida de conocimiento por la paciente; describe dolor, eritema y tal vez alguna fluctuación en el área de la herida quirúrgica.

35.   Para la visita del doctor Torres, el contaje de glóbulos blancos estaba en 17,800 y el diferencial demostraba 74 neutrófilos, entendiendo que había que descartar la presencia de un absceso pélvico o de seroma infectado, por lo que recomendó antibióticos.

36.   El 17 de diciembre el doctor Rivera Mercado efectuó un procedimiento en la herida abdominal de la paciente, encontrando un seroma en la herida que evacuó, limpió, desbridando el área, colocó drenajes y cerró la herida con grapas.

37.   El 19 de diciembre fue necesario llevar a la paciente a la sala de operaciones y suturar puntos sangrantes en el muñón vaginal.

38.   El 20 de diciembre el nivel de hemoglobina de la paciente se reportó en 7.7 gramos, siendo necesaria una nueva transfusión de sangre, siendo dada de alta al día siguiente, aparentemente sin sangramiento activo y con un nivel de hemoglobina de 11.0 gramos.

39.   Zoraida regresó una vez más a la sala de emergencias del Hospital Menonita de Caguas el 25 de diciembre a la 1:40pm, describiendo su queja como sangramiento vaginal de comienzo súbito, corroborándose un sangramiento activo al examen externo.

40.   A las 2:30pm se puso una consulta al doctor Rivera Mercado, la cual fue contestada a las 11:00pm, registrando la queja de sangramiento del muñón vaginal y ordenando su admisión, siendo su nivel de hemoglobina reportado esa tarde de 12.3 gramos.

41.   Una nota de las 4:20pm dice que se hizo reparación del muñón vaginal y que se removieron grapas quirúrgicas del área., siendo la paciente transferida a la sala de recuperación a las 5:00pm y ordenándose su alta una o dos horas después.

42.   El 31 de diciembre de 2014 Zoraida acude al Hospital Universitario del Centro Médico de Puerto Rico, donde fue admitida con una queja principal de sangramiento vaginal y diagnósticos de admisión de sangramiento por el muñón vaginal, hematoma pélvico y sospecha de enfermedad de von Willebrand.

43.   Se practicó una tomografía computadorizada el 1 de enero de 2015 en la que se identificó una colección retrovesical y supravesical con cambios sugestivos de absceso y hematoma, consultándose al servicio de Hematología/Oncología quienes no encontraron evidencia de desorden de la coagulación en la paciente y opinaron que el problema era uno producido por las cirugías previas.

44.   Se encontró la paciente con un nivel de hemoglobina de 6.5 gramos y un hematocrito de 19.5% por lo que se recomendó por hematología la administración de 2 unidades de glóbulos rojos, 4 unidades de plasma fresca congelada y 1 aféresis de plaquetas. El 4 de enero se administraron 2 unidades adicionales de glóbulos rojos.

45.   Se consultó, además, al servicio de Enfermedades Infecciosas quienes le dieron seguimiento a la terapia con antibióticos intravenosos. El contaje de glóbulos blancos el 31 de diciembre había sido de 23,100 con un contaje diferencial de 81% de neutrófilos.

46.   Para el 5 de enero se estaba manejando la condición de la paciente como que tenía sepsis clínica, habiendo presentado el 2 de enero un pico de fiebre de 39.5 grados centígrados, pero la curva de temperatura comenzó a mejorar y de ahí en adelante no superó 37.8 grados centígrados.

47.   El 12 de enero se repitió el CT-Scan abdomino/pélvico, encontrando una pequeña colección en el espacio paravesical encima del muñón vaginal, la cual se consideró una mejoría en comparación con el estudio anterior, no identificándose la presencia de fístula alguna.

48.   La evolución clínica de la paciente continuó mejorando y se le pudo dar de alta el 16 de enero de 2015. La nota médica de alta ofrece diagnósticos de absceso pélvico, sangramiento y pequeña dehiscencia del muñón vaginal. Sus signos vitales estaban estables. Su nivel de hemoglobina era de 12.7 gramos, su hematocrito era 39.1%, su contaje de glóbulos blancos era normal (9,730) y su contaje de plaquetas 589,000. Se le consideró lista para irse de alta a su casa y completar allí la terapia de antibióticos.

49.   El doctor Rivera Mercado sometió a la demandante a una cirugía sin indicación válida y, por tanto, sin consentimiento informado, removiéndole su útero y un ovario

innecesariamente, omitiendo la evaluación del endometrio que estaba indicada y que, con la mayor de las probabilidades, hubiese resuelto su problema de sangramiento uterino anormal al removerse los pólipos endometriales que en realidad tenía.

50.    La cirugía de histerectomía innecesaria y asimismo la remoción de ovario practicada por el doctor Rivera Mercado, constituyó un acto negligente o culposo, que ocasionó que la paciente desarrollara un hematoma/absceso que fue sospechado por un radiólogo que le hizo un CT-Scan desde el 10 de diciembre, y que fue ignorado o pasado por alto de forma negligente por el doctor Rivera Mercado.

51.    Luego de darla de alta tras la cirugía innecesaria, el doctor Rivera Mercado siguió manejando de forma negligente a su paciente, resultando ello en la causa de todos sus daños posteriores, porque, además, ignoró que el nivel de hemoglobina de la paciente continuaba descendiendo y su contaje de glóbulos blancos se mantenía elevado, no encontrando nunca la causa del problema que él le había provocado, viéndose obligada a acudir al centro médico para que la evaluaran correctamente y le resolviesen eventualmente sus problemas de salud.

52.    Como resultado de las desviaciones a la mejor práctica de la medicina del doctor Rivera Mercado, incluyendo la cirugía no indicada, la paciente ahora carece de su útero y de uno de sus ovarios y, además, padeció complicaciones de salud serias, que han sido relatadas en detalle precedentemente y que le disminuyeron significativamente su calidad de vida por mucho tiempo.

53.    El doctor Rivera Mercado ha sido demandado en múltiples ocasiones por actos u omisiones constitutivos de impericia médica, concluyendo al menos uno de esos casos judiciales con una sentencia en su contra y en favor de las víctimas de impericia médica.

54.    El historial completo de los casos judiciales sobre eventos de impericia médica en que el Dr. José A. Rivera Mercado ha sido demandado y que sus aseguradores han efectuado pagos en favor de sus víctimas surge del "National Practitioners Data Bank", un banco de datos al cual el hospital demandado tuvo o debió de tener acceso previo a concederle y renovarle privilegios para admitir y tratar pacientes en la referida institución hospitalaria.

55.    El presidente de la Junta de Directores del hospital demandado, el Director Médico, el Director de su Facultad Médica y el de su Departamento de Obstetricia y Ginecología estuvieron directa y activamente envueltos en el proceso de extenderle y renovarle, varias veces, los privilegios para admitir y tratar paciente como parte de la facultad médica y tenían pleno

conocimiento o debieron tenerlo, de los resultados de múltiples requerimientos de información al banco de datos de donde surgían los detalles de los casos de impericia médica que han sido radicados y concluidos mediante pagos relacionadas al médico demandado.

56.    No obstante haber tenido o debido tener conocimiento previo de las múltiples demandas de impericia médica en contra del doctor Rivera Mercado y del resultado de cada una de éstas, el hospital demandado decidió conceder privilegios y renovárselos para admitir y tratar pacientes gineco-obstétricos en la referida institución hospitalaria, exponiendo de esa manera a pacientes, como la demandante, a sufrir daños a sus manos, incurriendo por ello en negligencia corporativa.

57.    La responsabilidad corporativa incurrida en el proceso de extenderle y renovarle negligentemente o con conocimiento los privilegios a Rivera Mercado tiene un vínculo causal directo con los daños sufridos por la parte demandante.

58.    El Hospital Menonita de Caguas, Inc. es también responsable por la negligencia del doctor Rivera Mercado en función de la doctrina de autoridad aparente porque éste fue designado para tratar a la paciente en esa institución.

59.    La negligencia exclusiva de la parte demandada ocasionó los daños que ha sufrido la parte demandante y que se reclamarán subsiguientemente.

60.    Se incluye a Continental Insurance Company por haber expedido póliza de seguro en favor del médico codemandado y cubriendo los daños ocasionados por motivo de su negligencia profesional.

61.    Se incluye también a ABC Insurance Company, con nombre ficticio, por haber expedido póliza de seguro en favor del hospital codemandado, cubriendo los daños ocasionados por motivo de su negligencia corporativa y por la negligencia de su médico asignado para tratar a la paciente o por haber asegurado también al médico demandado.

62.    Como consecuencia de lo aseverado en los párrafos que preceden, la demandante Zoraida Montañez Carrasquillo ha sufrido, sufre y sufrirá daños y sufrimientos morales y angustias mentales por lo relatado que experimentó y experimentará, que estima en la suma de $500,000.00.

63.    La parte demandada es responsable solidariamente de los daños ocasionados a la parte demandante.

64.    El término prescriptivo aplicable a este caso fue debidamente interrumpido mediante la interposición de una demanda el 17 de octubre de 2015 ante el Tribunal de Primera Instancia, Sala de Caguas, que llevó el Número Civil EDP2015-0267, siendo desistida voluntariamente por la parte demandante el 18 de noviembre de 2015 y dictada sentencia Sin Perjuicio de conformidad.

**EN MERITO DE LO ANTERIOR**, se solicita de este Honorable Tribunal declare con lugar la presente demanda y, en su virtud, condene a la parte demandada a satisfacer a la parte demandante los daños reclamados, más las costas, intereses pre-sentencia y una suma razonable en concepto de honorarios de abogado.

CERTIFICO: Haber remitido copia del escrito que precede al Ledo. Miguel E. Sagardía De Jesús y a la Lcda. Nuyen Marrero Bonilla, s sus respectivas direcciones electrónicas.

En Caguas, Puerto Rico, a  28 de abril de 2016.

**VELÁZQUEZ LAW OFFICES, PSC**

Abogados de la parte demandante
PO Box 188
Caguas, Puerto Rico 00726
Tel. 787-744-9598
Fax 787-744-3482

José X Velázquez Ortiz
RUA 5338
E-mail: jfvlaw@gmail.com